**Kenneth GRAVES and Kenneth Davis, Appellants,**

v.

**ANSCHUTZ OIL CO., Inc., a corporation, Appellee.**

**No. 6281.**

United States Court of Appeals
Tenth Circuit.
July 12, 1960.

E. Albert Morrison, Tacoma, Wash., (R. B. Bowman, Lovell, Wyo., on the briefs), for appellants.

Houston G. Williams, Casper, Wyo. (W. J. Wehrli, Casper, Wyo., on the brief), for appellee.

1. Hereinafter called Atlantic.

2. Hereinafter called Husky.

Before MURRAH, Chief Judge, and PHILLIPS and BREITENSTEIN, Circuit Judges.

PHILLIPS, Circuit Judge.

On July 24, 1958, Graves and Davis entered into a "farmout" agreement with the Atlantic Refining Company[1] under which they agreed to drill at their sole cost and expense a test oil and gas well on certain lands located in Bighorn County, Wyoming, on which Atlantic held oil and gas leases. The test well was to be drilled to a depth sufficient to penetrate 100 feet into the Tensleep formation, the top of which was estimated to be 6,500 feet below the surface of the ground. Under the "farmout" agreement, Graves and Davis were to core and test any zones where a "show of oil and/or gas" was encountered and were to furnish certain information acquired from the drilling of the well to Atlantic. Upon the completion of the test well in accordance with the "farmout" agreement, Atlantic agreed to assign its leasehold interest in certain specified acreage to Graves and Davis. On October 16, 1958, Husky Oil Company[2] entered into an agreement with Davis, under which Husky, in consideration of the drilling of the test well and the making available or furnishing of certain geological information to it, agreed to contribute certain acreage to Davis on the completion of the well on or before June 1, 1959.

Graves and Davis entered into a rotary drilling contract with Anschutz Oil Company, Inc.,[3] under which it agreed to drill the test well for Graves and Davis.

The material portions of the drilling contract, which was prepared by Anschutz, read:

"1. Obligations. Contractor agrees to drill, core, test, survey, and finally complete and equip or plug and abandon, a test well for oil and gas at the time and place, to the depth, and in the manner provided

3. Hereinafter called Anschutz.

herein and in the specifications below, and owner agrees to pay contractor therefor the price set out in said specifications.

"2. Equipment And Labor.

"a. Furnished by Owner: Owner, at his expense, shall furnish the services and materials required of him in said specifications, and in addition thereto, all casing (both surface and production), tubing, wellhead connections, separators, flow lines, and other completion equipment installed in or upon said well and location, *and all required services and equipment of third persons for drill stem tests*, side wall cores, casing perforations, electrical logs, cementing (including surface and production casing and squeeze jobs), and all cement so required. (Italics ours.)

\* \* \* \* \*

"3. Performance. All such work shall be performed by contractor diligently, in a good and workmanlike manner, \* \* \*. Contractor shall be entitled to no compensation for any partial performance hereof, or upon any basis other than full and complete performance.

"Specifications

\* \* \* \* \*

"2. Commence actual drilling (spud in) by October 15, 1958.

"3. Drill to maximum depth of 6500 feet below surface, or 100 feet below the top of the Tensleep Sand.

\* \* \* \* \*

"d. Contract Price:

"1. Footage: For the depth actually drilled, exclusive of all footage cored, contractor shall be paid $9.00 per lineal foot.

"2. Day time:

"a. Rates: The day rates to be paid contractor by owner, when applicable, in addition to the footage payment above provided, shall be:

"No. 1. While drill stem in use: $35.4167 per hour;

"Plus 1–1/29 per foot per day

"No. 2. While drill stem not in use: $35.4167 per hour;

"b. Payable When: The above day rates shall be paid for all time consumed in:

\* \* \* \* \*

"(3) Drill stem tests;

\* \* \* \* \*

"E. Risk: The operations enumerated in subdivisions (1) to (9) inclusive of paragraph 'D-2-b' immediately above, shall be conducted at owner's risk and expense, provided however, that owner shall never be liable for contractor's negligence or want of skill or diligence, or for failure of contractor's equipment."

Graves and Davis entered into an agreement with E. M. Casey, under which Casey was to act as their representative and "be responsible for running operations on the \* \* \* test" well.

Anschutz moved its drilling rig onto the location and commenced the drilling of the well. Prior to the time of an endeavor to make the drill stem test hereinafter referred to and prior to the time the well had reached a depth of 4,000 feet, Graves and Davis had paid Anschutz $45,000 on the contract.

After the completion of the well into the Tensleep formation and the plugging of the well, Graves and Davis brought this action against Anschutz. In their first claim they sought recovery of $45,000 for alleged breach of the drilling contract and in the second claim they sought damages for alleged negligence and carelessness of Anschutz in the drilling of the well. Anschutz filed an answer and counterclaim in which it sought to recover $13,373.89 alleged to be due it under the drilling contract. From a judgment in favor of Anschutz for $7,090.18, with interest from the date of the judgment, Graves and Davis have appealed.

J. D. Dunwoody was Anschutz's drilling superintendent and Frank Kennedy was its "tool pusher."

When the drilling had proceeded to a depth of about 300 feet, 220 feet of new surface casing was supplied by Graves and Davis. It was examined by Casey and Kennedy and was then set in the hole. Thereupon, at Casey's request, the Halliburton Oil Well Cementing Company cemented the surface casing in place. The formation at the point where the casing was cemented was shale and the cement, at Casey's direction, was permitted to set for 48 hours, being 24 hours longer than the time provided for in the drilling contract. When the cementing was completed, both Casey and Kennedy were of the opinion that the cementing job had been properly done. When the cement had set, it became necessary to drill the cement out of the inside of the casing to remove the cement plug. It is customary to take unusual precautions while drilling out a cement plug. The drill log showed the drill revolved at a speed in excess of 200 RPM's while the plug was being drilled out. Kennedy testified that 200 RPM's was the maximum speed of the rig and that the driller who made the log must have been mistaken as to the speed.

At the trial Casey testified that he had a conversation with Kennedy right after the cementing job had been finished, with respect to the installation of rubber bumpers on the drill pipe;[4] that he said to Kennedy, "Are we going to get rubbers to that drill pipe?" and that Kennedy answered, "Yes, I will do what I can about it"; that drilling was started without the rubber bumpers having been installed, and that he again asked Kennedy whether they were going to get rubber bumpers and that Kennedy replied that some rubbers were coming. Casey admitted that he did not request that drilling be suspended until the rubber bumpers were installed and that the rubber bumpers were installed three or four days after he made his request.

When the cement plug had been drilled out Anschutz proceeded with the drilling of the well. When drilling had progressed approximately 1,800 feet, the lowest section of the surface casing separated from the section above it at their joint and dropped downward in the hole a distance of approximately 40 feet.

Kennedy testified that Casey first requested the installation of the rubber bumpers on the drill pipe after the section of the surface casing came off and that they were then installed and thereafter maintained on the drilling pipe.

Casey further testified that when the drilling had proceeded to a depth of about 60 feet below the lower end of the surface casing he suggested to Ross, a driller for Anschutz, that the drilling speed was a little too fast and that Ross replied he was following orders.

After the section of the surface casing separated and fell in the hole, an expert was called in to run an electric log and ascertain the location of such section in the hole. When the electric log was completed a conference was had among Davis, Graves, Casey, Kennedy, Dunwoody and Mr. Alloway, a vice president of Anschutz. After discussing the matter, Casey and Dunwoody decided that it would be more economical to line up the parted section of surface casing and cement it in place. Thereupon, Casey called Halliburton Oil Well Cementing Company and it lined up the parted section of surface casing and cemented it in place. The cement was allowed to set for 48 hours.

When the well had reached a depth of approximately 1,500 feet, Casey suggested to Kennedy that it would be desirable and tend to avoid trouble if he would mud-up through the shales which the drilling passed through. Kennedy agreed and the mudding operations were carried out.

After the parted section of surface casing had been cemented in place, drilling operations proceeded. The Phosphoria or Embar formation was reached at an

---

4. The function of a rubber bumper is to act as a shock absorber between the drill pipe and the casing and to protect the casing from damage due to impacts between the drill pipe and the casing.

approximate depth of 4,766 feet. A core sample of the Phosphoria was taken between 4,770 and 4,823 feet. The core was 49 feet long. The core sample was examined by Richard Swirczynski, a geologist employed by Graves and Davis. He took representative samples of the top of each foot of the core and examined them under a miscroscope. The core was placed in a plastic bag to protect it and was later sent to a core laboratory service in Billings, Montana, for analysis and a report of the analysis was furnished to Graves and Davis. Swirczynski also examined the drill samples at the well site. He then called for a drill stem test of the Phosphoria. The purpose of a drill stem test is to determine the potential fluid productivity of a geologic formation. In order to make the test it is necessary to attach an expandable packer, a section of perforated pipe below the packer and a valve mechanism to the drill pipe or drill string and lower the same into the hole to its desired position.

Casey employed Johnston Testers to run the drill stem test. Owen E. Solomon, a specialist at testing, employed by Johnston Testers, came to the well site with the necessary tools. Kennedy, Casey, Solomon and the drilling crew were present. The rig was put on Day Time for the test. Casey supervised the operations on the attempted drill stem test. Several attempts were made to lower the test mechanism into the hole, but they were not able to get the test mechanism past the point where the parted surface casing had been cemented. The difficulty was caused by the fact that the shale at the point where the loose casing had been cemented had caved in. Various devices were tried in an attempt to guide the testing mechanism down through the parted section of surface casing, without success. The effort to get the packer and test mechanism into the hole continued about 24 hours. Casey then decided that it would be desirable to discontinue the efforts to make the test and to continue the drilling into the Tensleep formation. At the time the efforts to make the drill stem test were discontinued

Casey had received a telegram from Atlantic consenting that the drill stem test need not be made. Davis approved that procedure and the drilling was then continued into the Tensleep formation and core samples were taken from that formation. Neither Graves, Davis nor Casey requested a drill stem test in the Tensleep formation.

Casey testified that a drill stem test is a very hazardous operation and for that reason "a lot of people avoid it completely." He was apparently mindful of such hazard and of the benefits that would accrue to Graves and Davis under the Atlantic and Husky agreements on completion of the drilling into the Tensleep formation and did not want to risk losing the hole before it had been completed into the Tensleep formation.

After the well had been completed to a depth of 100 feet below the top of the Tensleep formation, that formation was cored and electric logs run on both the Tensleep and Phosphoria formations.

There was evidence that the section of the surface casing parted because it was not cemented in a solid formation and the formation caved out from behind the section. There was also evidence that excessive drill speeds were not used.

Three expert witnesses called by Anschutz testified that a drill stem test could have been made in the Phosphoria by other methods than those employed before the drill stem test was abandoned.

Before the electric logs were run, after the drilling had been completed in the Tensleep formation, a seven inch casing was run in the hole from the surface to a point past the lower end of the parted section of the surface casing. Dunwoody testified that the testing device could have been inserted in the hole through the seven inch casing. He also gave as his opinion that an eight and five-eighths inch casing could have been inserted in the hole past the point where the difficulty developed and the testing device could have been inserted through such casing. Testimony to the same effect was given by Kennedy and Solomon. Moreover,

Casey testified that they could have run an eight and five-eighths inch casing past the point of difficulty, inserted the testing apparatus through that casing and made the drill stem test.

Casey provided the seven inch casing and directed that it be inserted in the hole past the loose section of surface casing before the electric logs were run, in order to insure getting the testing device through the lower, separated section of the surface casing down into the hole and back again out of the hole. The casing was run as Casey directed.

Swirczynski made a determination that neither formation was productive and so reported to Graves and Davis. He testified that he had sufficient data and information to make that determination without a drill stem test of the Phosphoria. After such report Davis directed Casey to have the hole plugged and that was done.

The trial court found that Anschutz fully complied with the terms and provisions of the drilling contract and drilled the test well within the time, at the location, in the manner and to the depth required by such contract and performed the work diligently and in a good and workmanlike manner; that it could not have foreseen the separation of the lowest section of the surface casing at the joint between it and the section above it and that it was not guilty of negligence.

■ While the contract provided that Anschutz was to test the well in the manner provided in the contract and specifications, it is clear that drill stem tests, electrical logs and cementing jobs were to be carried out under the direction of Casey and by third persons specially skilled in such work and with equipment furnished by such persons, except that Anschutz was to provide the needed ordinary equipment which it had at the well site and personnel to operate such equipment.

It follows, we think, that the obligation of Anschutz under the drilling contract was to drill a well in a good and workmanlike manner and in which the tests specified in the contract could be carried out.

There was substantial evidence that the drill stem test in the Phosphoria formation could have been made by methods not employed by Casey and the testing company and that Casey directed the abandonment of the drill stem test without utilizing methods by which the test could have been made.

■ There was little, if any, evidence in support of the claim of negligence and there was substantial evidence supporting the trial court's finding that Anschutz performed its work and completed the well in a good and workmanlike manner and was not guilty of negligence in the drilling of the well.

Upon consideration of the entire evidence, we cannot say that we are left with a definite and firm conviction that the trial court made a mistake in its findings of fact.[5] It follows that the findings of the trial court were not clearly erroneous and may not be set aside by this court.[6]

The judgment is affirmed.

5. See United States v. Neel, 10 Cir., 235 F.2d 395, 399.

6. Henderson v. Pierson, 10 Cir., 201 F.2d 740, 741.